# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 15-cv-00445-KLM

**JAMIE LEE DOWLING,** Individually as surviving mother of RAYLEE KAY
DOWLING; and as surviving mother of LANDYN SCOTT DOWLING,

Plaintiffs,

v.

**GENERAL MOTORS, LLC** and KEY SAFETY SYSTEMS, INC., Defendants

## SHAWN COOK'S RESPONSE TO PLAINTIFF JAMIE LEE DOWLING'S MOTION TO ALLOCATE SETTLEMENT PROCEEDS RE: LANDYN SCOTT DOWLING, DECEASED

Respondent, Shawn Cook, by and through his attorneys, Gregory R. Giometti &

Associates, P.C., hereby submits his Response to Plaintiff Jamie Lee Dowling's Motion to

Allocate Settlement Proceedings Re: Landyn Scott Dowling, Deceased, as follows:

### INTRODUCTION

On August 10, 2017, Plaintiff, Jamie Lee Dowling ("Plaintiff" or "Ms. Dowling"),

filed her Motion to Allocate Proceeds Re: Landyn Scott Dowling, Deceased ("the

Motion")(Doc. #19) and a supporting legal Memorandum ("the Memorandum")(Doc. # 19-

1).  The theme of the Motion and the Memorandum is that Landyn's father, Shawn Cook

("Mr. Cook"), abandoned his son, and, therefore, pursuant to C.R.C. 13-21-201(1)(c)(III),

100% of the settlement proceeds should be allocated to Ms. Dowling.[1]  Ms. Dowling's

---

[1] At this point in time, Mr. Cook does not know the amount of the settlement, as Ms. Dowling's counsel have refused to provide that information, saying the amount is confidential.

contention that Mr. Cook abandoned Landyn is a malicious fabrication. Furthermore, Ms. Dowling's Declaration and the Memorandum are replete with fabrications, misrepresentations, misstatements and misleading information. Attached hereto are Affidavits and declarations of numerous witnesses who have personal knowledge of the relationship between Ms. Cook and his family and Landyn, and who also have personal knowledge of Ms. Dowling's actions and behavior during the course of Landyn's infancy and childhood up until his tragic death. These Affidavits and declarations show that Mr. Cook was a loving father, who provided emotional and financial support to his son, and who wanted to have a relationship with his son. However, Ms. Dowling intentionally thwarted these efforts by denying Mr. Cook's paternity, claiming Mr. Cook was dead, threatening to withhold Landyn from Mr. Cook and his family unless they complied with her demands, refusing to tell Mr. Cook or his family of her and Landyn's whereabouts, and physically separating herself and Landyn from Mr. Cook and his family by progressively moving farther and farther away from them, ultimately ending up in Alpine, Texas, more than 500 miles away from Mr. Cook's home. Contrary to Ms. Dowling's claim of abandonment, the evidence supports the conclusion that Ms. Dowling was a nomadic, unstable and irresponsible parent, who cruelly deprived Mr. Cook and his family of a relationship with Landyn. Therefore, the Motion for a 100% allocation to Ms. Dowling should be denied. Rather, the Court must conduct an evidentiary hearing so that Mr. Cook has an opportunity to be heard and to present evidence regarding his relationship with Landyn. C.R.S. § 13-21-201(1)(c)(II).

## FACTUAL HISTORY

1.      In 2007, Mr. Cook and Ms. Dowling had a relationship that resulted in Ms. Dowling becoming pregnant with Landyn.  At the time of the pregnancy, Mr. Cook was a high school Senior and Ms. Dowling was a high school Sophomore, attending different high schools in east Texas, near Athens, TX.

2.      Neither Mr. Cook nor his parents ever asked Ms. Dowling to have an abortion.  Mr. Cook was never physically abusive to Ms. Dowling, not while she was pregnant nor at any other time thereafter.  In fact, Ms. Dowling struck Mr. Cook several times, and even intentionally kicked him in the groin once.  *See* **Exhibit A - Affidavit of Gary Cook**, attached hereto.

3.      One day, when Ms. Dowling was pregnant with Landyn, Mr. Cook received a voicemail message from an Officer with the Gun Barrel City Police Department, asking him to come into the police station to answer questions related to allegations made by Ms. Dowling that Mr. Cook had physically attacked her earlier that day at an ATV park. Gun Barrel City is 21 miles from Athens, TX.  Mr. Cook, his brother Chris, and his mother reported to the Gun Barrel City police station and answered questions.  Ms. Dowling was also present at the station, in a separate room.  Mr. Cook correctly told the police officers that he had been on the lake with friends and family all day, and had not gone to any ATV park.  After taking Mr. Cook's statement, the Gun Barrel Police let Mr. Cook return home, and no further contact was made.  **Exhibit B - Affidavit of Amy Cook**, attached hereto. No criminal charges were ever filed by Ms. Dowling related to this incident.

4.      Landyn was born on November 2, 2007 in Dallas County, TX.  Mr. Cook visited Ms. Dowling and the newborn Landyn in the hospital, along with a friend, Corey

3

Jannasch.  At the hospital, Ms. Dowling would not permit Mr. Cook's name to be placed on Landyn's birth certificate.  On Landyn's Texas birth certificate, Ms. Dowling is listed as the mother and the spot for "Father" is left blank.  *See* **Exhibit C - Landyn's Birth Certificate**, attached hereto.

5.      After Landyn's birth, Mr. Cook stayed with Ms. Dowling at her mother's home for a few days, to help out with the new baby.  At this time, Ms. Dowling lived in Gun Barrel City, TX.  Throughout the first years of Landyn's life, Mr. Cook purchased diapers and clothing on a consistent basis.  *See* **Exhibit A - Affidavit of Gary Cook**, attached hereto.  Mr. Cook wanted to spend time with his son and contribute, both emotionally and financially, to Landyn's upbringing.

6.      During the early years of Landyn's life, Ms. Dowling would frequently bring Landyn to the house where Mr. Cook lived with his parents Gary and Amy Cook, in Malakoff, TX.  Malakoff, TX is 10 miles from Athens, TX, and 17 miles from Gun Barrel City, TX.  However, because Ms. Dowling usually came over unannounced, there were times that Mr. Cook would not be home at the time of their visit.  If Mr. Cook was not at home, Ms. Dowling would frequently leave Landyn in the care of Mr. Cook's mother.  *See* **Exhibit A - Affidavit of Gary Cook and Exhibit B - Affidavit of Amy Cook**, attached hereto.  Landyn was the Cook family's 16th grandchild, other grandchildren were frequently at the house, and Amy and Gary Cook enjoyed spending time with Landyn just as they did with their other grandchildren.  It was not unusual for Ms. Dowling to leave Landyn with the Cook family for several days, including overnights.  It was also not unusual for Ms. Dowling to call in advance, say she was bringing Landyn over, and then never show up.  Mr. Cook purchased a crib for Landyn, and Landyn would sleep in Mr.

Cook's bedroom in the crib.  When he was home, Mr. Cook provided all care for Landyn. Throughout Landyn's life, he would spend time at the Cook family home, as evidenced by the photographs attached hereto as **Exhibit D – COOK PHOTOS 000001-000025.**

7.      When Landyn was an infant, in either 2007 or 2008, at Mr. Cook's urging, Ms. Dowling agreed for Landyn to undergo a paternity test.  Mr. Cook wanted to secure his parental rights for Landyn.  Mr. Cook and Ms. Dowling met at Mr. Cook parent's home, and all three of them provided genetic material by way of a cheek swab, and sent the test away for paternity results.  *See* **Exhibit A - Affidavit of Gary Cook**, attached hereto.  The test results came back with a 99.9% probability that Mr. Cook was Landyn's father.  *See* **Exhibit A - Affidavit of Gary Cook**, attached hereto.

8.      In late 2008 or early 2009, Mr. Cook began working as an electrical lineman.  In this job, which he still holds today, he works 10 days in a row, and then has 4 days off.  He is frequently sent to far-flung parts of the state, generally with little notice.

9.      Mr. Cook's sister-in-law, Monica Cook, babysat for Landyn several times in her home in Malakoff, TX when he was a baby and also when he was a toddler.  Ms. Dowling allowed Monica Cook to babysit Landyn only on the condition that she not tell Mr. Cook or his parents that Landyn was at her home.  *See* **Exhibit E - Declaration of Monica Cook**, attached hereto.  Monica Cook agreed, because she enjoyed caring for Landyn and wanted to have a relationship with him. Sometime thereafter, Jamie Cook and Monica Cook moved to a new home in Athens, TX.  At this time, Mr. Cook also resided with Monica Cook, his brother, and their family.  Ms. Dowling knew that Mr. Cook lived there, and would sometimes bring Landyn by for babysitting and permit Mr. Cook to spend

time with his son. Landyn loved these visits and would usually cry when it was time to leave with Ms. Dowling.  *See* **Exhibit E - Declaration of Monica Cook**, attached hereto.

10.     Mr. Cook's parents' home in Malakoff, TX is located very close to a lake. Gary and Amy Cook have a boat, and enjoy boating with their children and grandchildren. As stated above, Landyn was always welcome at the Cook family home, and was a regular visitor.  If Landyn had been present at any time when the Cook family was boating, he would have been invited to participate, and a life jacket absolutely would have been provided for him.  The Cooks have many child-size life jackets in their boathouse, and no child would ever be permitted on the boat without a life jacket.  *See* **Exhibit A - Affidavit of Gary Cook, and Exhibit B - Affidavit of Amy Cook**, attached hereto.  Landyn was never excluded from any activity or treated differently from his cousins.

11.     At some point in either 2009 or 2010, Ms. Dowling moved with Landyn to Garland, TX.  Garland is approximately 77 miles from Malakoff.  The date of this move is uncertain because Ms. Dowling refused to provide Mr. Cook with information about his son's whereabouts, and only contacted him infrequently, generally to ask for money. When Ms. Dowling would call Mr. Cook to ask for money, in return, he would always ask where she and Landyn were, and for an address where a check could be mailed.  Ms. Dowling would consistently refuse to provide Landyn's location, instead demanding that Mr. Cook send money via a wire transfer that she could pick up at an anonymous location.

12.     One day in 2010, when Ms. Dowling was pregnant with a second child, whose father Ms. Dowling admits was a married man, she and Landyn visited the Cook's home in Malakoff, TX and told Amy Cook that she was married to a doctor from

Oklahoma, and they were living in Colorado.   **Exhibit B - Affidavit of Amy Cook**, attached hereto.  This was not true.

13.     In February 2011, Ms. Dowling gave birth to a girl named Raylee.  Mr. Cook is not the father of Raylee, and was not in contact with Ms. Dowling at the time of her second pregnancy.  It is unknown precisely where Landyn was living at this time.

14.     On June 18, 2011, Landyn attended the Mesquite Pro Rodeo with Mr. Cook and many other members of the Cook family.  *See* **Exhibit F - Declaration of Chad Kellar**, **Exhibit G -** Decla**ration of Maria Cook, and Exhibit H - Declaration of Jill Stewart-Kellar**, attached hereto.  This was a unique opportunity for Mr. Cook to spend the day with his son, and he purchased matching outfits for him and his son to wear.  *See* **Exhibit D - COOK PHOTOS 000021-000023**, attached hereto.  Indeed, because Ms. Dowling did not provide any type of overnight bag for Landyn, Mr. Cook had to purchase his son's necessities for the weekend, including underwear, socks, shirts, etc.  *See* **Exhibit I - Affidavit of Desiree Dusang**, attached hereto.  By all accounts, Landyn had fun at the rodeo, enjoyed being close to his father and played with many of his aunts, uncles and cousins.  *See* **Exhibit F - Declaration of Chad Kellar, Exhibit G - Declaration of Maria Cook, Exhibit H - Declaration of Jill Stewart-Kellar, Exhibit J - Declaration of Christopher Cook and Lisa Cook, and Exhibit K - Declaration of Jason Cook**, attached hereto.  Ms. Dowling did not attend this event.  *See* **Exhibit J - Declaration of Christopher Cook and Lisa Cook, and Exhibit K - Declaration of Jason Cook**, attached hereto.     Once Ms. Dowling returned to pick Landyn up on Sunday, she demanded all of the clothing Mr. Cook had purchased for him, saying that Mr. Cook would

have no further need for them. *See* **Exhibit I - Affidavit of Desiree Dusang**, attached hereto.

15.     In July 2011, Ms. Dowling, along with Landyn and Raylee moved to Alpine, TX.  *See* **Exhibit L - Affidavit of Janna Conn**, attached hereto.  Alpine is 530 miles from Malakoff, TX, and is located on the far western side of the state.  Alpine is more than an 8-hour drive from Malakoff, where Mr. Cook and his family lived.  Ms. Dowling never informed Mr. Cook that she was moving Landyn to Alpine.  Mr. Cook was unaware that Ms. Dowling had relocated his son to Alpine, TX.  *See* **Exhibit A – Affidavit of Gary Cook.**

16.     While in Alpine, Ms. Dowling became a member of the congregation of Grace Christian Fellowship Church.  *See* **Exhibit M - Affidavit of Shirley Williams**, attached hereto.  Shirley Williams is a founder and a Senior Pastor at Grace Christian Fellowship Church.  Ms. Dowling told Ms. Williams that that her sister had died, and sought money from the congregation to travel to her funeral.  The congregation took up a collection to give to Ms. Dowling to enable her to attend her sister's funeral.  *See* **Exhibit M - Affidavit of Shirley Williams**, attached hereto.  Ms. Dowling also told Ms. Williams that her entire family was dead, that there was no one left.  These statements were lies, and Ms. Dowling has several living family members, including her sister.  Ms. Dowling also told Ms. Williams that the fathers of both of her children, Landyn and Raylee, were dead. She told Ms. Williams that Landyn's father was killed in a "stabbing fight," and that Raylee's father was killed in a "car wreck explosion." *See* **Exhibit M - Affidavit of Shirley Williams**, attached hereto.  Neither of these statements were true.

17.     Also while in Alpine, Ms. Dowling befriended a woman named Janna Conn.  Ms. Conn frequently took care of Landyn and his sister, frequently for days at a time, including overnights.  *See* **Exhibit L - Affidavit of Janna Conn**, attached hereto. Ms. Dowling told Ms. Conn that both of the fathers of her children were dead.  Ms. Dowling also told Ms. Conn that everyone in her family was dead, and that she moved to Alpine to start over.  *See* **Exhibit L - Affidavit of Janna Conn**, attached hereto.  Ms. Conn observed Ms. Dowling being abusive to Landyn: one day, in Ms. Conn's home, Ms. Dowling had her thumb in Landyn's mouth, jerking his head sideways, while hitting him with her other hand.  Ms. Conn was forced to intervene and stop this abuse.  *See* **Exhibit L - Affidavit of Janna Conn**, attached hereto.  At another time, Ms. Conn observed that Landyn had a large hematoma on his forehead.  Ms. Dowling told Ms. Conn that Landyn had fallen at school. Ms. Conn learned that Ms. Dowling told the teachers at Landyn's school that he had fallen at home.  *See* **Exhibit L - Affidavit of Janna Conn**, attached hereto.

18.     Ms. Dowling also told Ms. Williams and the rest of the Grace Christian Fellowship Church that she had cancer, and had to travel to Dallas twice a month for treatment.  *See* **Exhibit M - Affidavit of Shirley Williams**, attached hereto.  This was untrue.  Another member of the congregation, Roy Largent, began a relationship with Ms. Dowling, in part because he was sympathetic towards her, and took care of her, providing her with high quality organic food, among other things.  Mr. Largent was approximately 40 years older than Ms. Dowling.  Mr. Largent and Ms. Dowling got married.  This marriage ended swiftly after Ms. Dowling accused Mr. Largent of violence toward her.  *See* **Exhibit M - Affidavit of Shirley Williams**, attached hereto.  This accusation had no merit.  *See*

**Exhibit M - Affidavit of Shirley Williams**, attached hereto.  Prior to leaving Texas for Colorado, Ms. Dowling began a relationship with one of Mr. Largent's employees, Mike Willson.  *See* **Exhibit L - Affidavit of Janna Conn**, attached hereto.

19.     On March 7, 2013, Ms. Dowling, Landyn and Raylee left Alpine and drove north to Colorado.  *See* **Exhibit N - Victim Advocate Kristen Foust's March 10, 2013 email (CSP REPORT 000128-000129),** attached hereto.   Ms. Dowling traveled to Colorado with Mr. Willson.

20.     On May 9, 2013, at 8:00 a.m., Landyn was killed in a car accident on CO Highway 50, at Mile Marker 169 in Gunnison County, CO.  Ms. Dowling was driving the Vehicle, and the Colorado State Patrol Traffic Accident Report notes that she was traveling at an unsafe speed for the conditions of the roadway.  *See* **Exhibit N - Traffic Accident Report (CSP REPORT 000066-000067)**, attached hereto. It was snowing at the time of the accident, and there was snow on the roadway.  Furthermore, at the time that Colorado State Patrol deputies arrived at the scene of the accident, Landyn was seated in the rear of the Vehicle, not wearing a seatbelt at the time first responders arrived on-scene.  *See* **Exhibit N - Traffic Accident Report (CSP REPORT 000046)**, attached hereto.

21.     On August 14, 2013, Ms. Dowling pled guilty to two counts of Careless Driving Resulting in Death in Gunnison County District Court.  *See* **Exhibit O, Sentencing Record**, attached hereto.

22.     Ms. Dowling's Memorandum, filed August 10, 2017, states on the very first page that "Raylee and Landyn were restrained in their child seat and booster seat in the rear seats."  Memorandum, Dkt. 19-1 at p. 1.  This is not true; Landyn was not in either a child seat or booster seat at the time of the accident.  The Colorado State Patrol Fatal Crash

Report, authored by Technician Garth Crowther, states that "it appeared that the young male passenger was in the rear right passenger seatbelt. The seat belt was pulled out and would not retract." *See* **Exhibit N - Traffic Accident Report (CSP REPORT 000044),** attached hereto. The Report further states '[t]he young boy was 5 years old and should have been in a child safety seat." *See* **Exhibit N - Traffic Accident Report (CSP REPORT 000044)**, attached hereto. It is therefore undisputed that Landyn was not seated in a child safety seat at the time of the accident, and may not have even been wearing a seat belt.

23.    In the immediate aftermath of the accident, while still at the scene, Ms. Dowling told EMS first responder Ross Downs that "her outcome did not matter because she had cancer." *See* **Exhibit N - Traffic Accident Report (CSP REPORT 000046),** attached hereto. Ms. Dowling has never had a cancer diagnosis.

24.    After the accident, Ms. Dowling reported to law enforcement personnel, medical providers, and others that her boyfriend at the time, Mike Willson, was the father of both Landyn and Raylee. *See* **Exhibit A - Affidavit of Gary Cook**, attached hereto. This is obviously false. Once the Cook family learned of this error, it was corrected, and Mr. Cook's name was placed on Landyn's death certificate. *See* **Exhibit P - Death Certificate,** attached hereto.

25.    Landyn's funeral took place on March 16, 2013 in Mabank, TX. Ms. Dowling consistently lied to the Cook family about the date and location of the funeral in an attempt to prevent them from attending. *See* **Exhibit A - Affidavit of Gary Cook**, attached hereto. It was arranged for the Cook family to have a private viewing prior to the funeral, and at the actual funeral, Ms. Dowling and her family were separated from the

Cook family by a glass partition.  More than 50 members of the Cook family, as well as friends, attended Landyn's funeral.  *See* **Exhibit X - Funeral Guest Book**, attached hereto. After the funeral, members of Ms. Dowling's family approached Mr. Cook and expressed surprise that he was alive, because Ms. Dowling had told her family that Mr. Cook had been killed years before in a "stabbing fight."  *See* **Exhibit A - Affidavit of Gary Cook**, attached hereto.  Also on the day of Landyn's funeral, Ms. Dowling told Monica Cook "I'm sorry I kept Landyn from you all, I am so sorry."  *See* **Exhibit E - Declaration of Monica Cook**, attached hereto.

26.     After his son's death, Mr. Cook got a tattoo of his son's name and image on his right arm.  Landyn's name is spelled correctly.  *See* **Exhibit R - photographs of Mr. Cook's tattoo (COOK PHOTOS 000026-000027)**, attached hereto.

27.     In June 2014, Mr. Cook and Ms. Dowling executed a Full and Final Release and Settlement Agreement pertaining to the establishment of Landyn's estate and the allocation of some insurance proceeds.  *See* **Exhibit S - Full and Final Release and Settlement Agreement**, attached hereto.  Namely, Mr. Cook received an insurance benefit from Esurance, Ms. Dowling's automobile insurer at the time of the accident.  Mr. Cook also received the proceeds of a small life insurance policy for Landyn held by Ms. Dowling's mother, Dana Valderas.  After receiving these proceeds, Mr. Cook made a $7,500 payment to Ms. Dowling.  *See* **Exhibit T - Copy of Check to Ms. Dowling's attorneys**, attached hereto.

28.     After Landyn's death, a proceeding to determine the heirship of his estate was initiated in Henderson County, TX.  On July 14, 2014, the County Court of Henderson County issued a Judgment Declaring Heirship, ordering that Ms. Dowling and Mr. Cook

were each entitled to a one-half share of Landyn's estate.  *See* **Exhibit U - Judgment Declaring Heirship**, attached hereto.

## LEGAL STANDARD

C.R.S. § 13-21-201(1)(c) provides as follows:

> (II) For cases in which the father and mother are divorced, separated, or living apart, a motion may be filed by either the farther or the mother prior to trial requesting the court to apportion fairly any judgment awarded in the case. *Where such a motion is filed, the court shall conduct a post-judgment hearing at which the father and the mother shall have the opportunity to be heard and to produce evidence regarding each parent's relationship with the deceased child.*
>
> (III) On conclusion of the post-judgment hearing conducted pursuant to subparagraph (II) of this paragraph (c), the court shall fairly determine the percentage of the judgment to be awarded to each parent. In making such a determination, the court shall consider each parent's relationship with the deceased, including custody, control, support, parental responsibility, and any other factors the court deems pertinent. The court's determination of the percentage of the judgment awarded to each parent shall not be disturbed absent an abuse of discretion.

[Emphasis added.]    Since the Plaintiff has filed the Motion, the Court ***must*** conduct a hearing, at which both Mr. Cook and the Plaintiff will be allowed to present evidence, before making the findings required for apportionment of the settlement proceeds.

## ARGUMENT

### A.    The Evidence Presented by Mr. Cook Contradicts and Refutes Plaintiff's Contentions.

To support her contention that Mr. Cook abandoned Landyn Ms. Dowling has presented Affidavits and Declarations from a number of witnesses, including herself (Doc. # 19-2); Dana Valderas (Doc. # 19-3); Calvin Dowling (Doc. # 19-4); John Orr (Doc. # 19-5); Jamie Perdue (Doc. # 19-6); Luke Bevill (Doc. # 19-7); and Eric Johnson (Doc. # 19-

8).   The evidence submitted by Mr. Cook contradicts and refutes Ms. Dowling's evidence, both regarding her general theme of abandonment, as well as the specific factual details Ms. Dowling uses to support her argument. This evidence may be summarized as follows:

- Ms. Dowling asserts that Mr. Cook was verbally and physically abusive, and specifically cites an incident that allegedly occurred at an ATV park when she was pregnant with Landyn while her friends were riding 4-wheelers.  *See*  Doc. # 19-2, ¶¶ 5-7; Doc. # 19-5, ¶¶ 6-7; Doc. # 19-8, ¶ 6.  Two of the witnesses, Mr. Orr and Mr. Johnson, did not see the incident.  Their statements are inadmissible hearsay. Mr. Cook spoke with the police and established that he was a different location at the time of the alleged incident.  No charges were filed against Mr. Cook as a result of the alleged incident.  *See* **Exhibit B - Affidavit of Amy Cook**, ¶ 4; **Exhibit A - Affidavit of Gary Cook**, ¶ 4.b.  Contrary to Ms. Dowling's assertions of being a victim of abuse, she was verbally and physically abusive to Mr. Cook, who has had a seizure disorder since birth.  *See* **Exhibit A - Affidavit of Gary Cook**, ¶ 4.c.; See **Exhibit V - Declaration of Jessica Cook** and **Exhibit E – Declaration of Monica Cook**.

- Ms. Dowling asserts that Mr. Cook drank a lot of alcohol and had criminal charges filed against him.  *See* Doc. # 19-2, ¶ 8.  Mr. Cook's alleged use of alcohol is disputed.  *See* **Exhibit A - Affidavit of Gary Cook**, ¶ 4.c.  The allegations of criminal conduct are irrelevant, as there is no evidence of any felony conviction, and none of the charges pertain to Ms. Dowling or Landyn.  *See* Doc. # 19-9.

- Ms. Dowling asserts that after Landyn was born on November 2, 2017, Mr. Cook stopped by the hospital only briefly, and this was one of four times Mr. Cook saw

Landyn during his life.  *See* Doc. # 19-2, ¶ 10.  These statements are untrue.  *See* **Exhibit B - Affidavit of Amy Cook**, ¶ 3.b; *See* **Exhibit A - Affidavit of Gary Cook**, ¶ 4.d.

- Ms. Dowling alleges that she sought to establish a relationship with Mr. Cook after Landyn was born, but Mr. Cook was not interested, and Mr. Cook's family was not nice to her and didn't want her to intrude into their lives.  *See* Doc. # 19-2, ¶ 11. These contentions are false.  *See* **Exhibit B - Affidavit of Amy Cook**, ¶ 3.c.; **Exhibit A - Affidavit of Gary Cook**, ¶ 4.e.; and **Exhibit I - Affidavit of Desiree Dusang**, ¶ 8.

- Ms. Dowling alleges that Mr. Cook showed up drunk at Landyn's first birthday on November 2, 2008 with a "bounce house."  *See* Doc. # 19-2, ¶ 12.  Mr. Cook contests this allegation.  *See* **Exhibit A - Affidavit of Gary Cook**, ¶ 4.f.

- Ms. Dowling's statements about a boating incident with the Cook family at the Reservoir, where Mr. Cook arrived drunk and there was no life jacket for Landyn are fabricated.  *See* Doc. # 19-2, ¶ 13; S*ee* **Exhibit B - Affidavit of Amy Cook**, ¶ 3.d.; **Exhibit A - Affidavit of Gary Cook**, ¶ 4.g.

- Ms. Dowling's statements about the rodeo are false.  *See* Doc. # 19-2, ¶ 14.  Ms. Dowling was not present at the rodeo.  As shown by the Cook family photographs taken at the rodeo, this was a wonderful experience for Landyn and showed the close bond between Mr. Cook and Landyn.  *See* **Exhibit B - Affidavit of Amy Cook**, ¶ 3.e.; **Exhibit A - Affidavit of Gary Cook**, ¶ 4.h.; **Exhibit I - Affidavit of Desiree Dusang**, ¶¶ 4-6; **Exhibit J - Declarations of Christopher and Lisa Cook**, **Exhibit F – Declaration of Chad Kellar, Exhibit E – Declaration of Monica**

**Cook, Exhibit G – Declaration of Maria Cook, Exhibit H – Declaration of Jill Stewart-Kellar, Exhibit V – Declaration of Jessica Cook, Exhibit K – Declaration of Jason Cook, and Exhibit W – Declarations of Cory and Lori Cook.**

- Ms. Dowling alleges that after the rodeo, that occurred on June 18, 2011, just less than 21 months before Landyn's death, Mr. Cook never saw Landyn again.  *See* Doc. # 19-2, ¶ 15.  As shown below, this statement is misleading.  Ms. Dowling then asserts that she never tried to keep Mr. Cook from seeing Landyn.  *See* Doc. # 19-2, ¶ 17.  This statement is an example of Ms. Dowling's utter mendacity.  *See* **Exhibit B - Affidavit of Amy Cook**, ¶ 3.f.; **Exhibit A - Affidavit of Gary Cook**, ¶ 4.i. & k.; **Exhibit E - Declaration of Monica Cook**.  In truth, Mr. Cook couldn't see Landyn during this time period because Ms. Dowling moved farther and farther away, until she reached Alpine, Texas, which is over 500 miles from the Athens area, where Mr. Cook lived.  In addition, Ms. Dowling refused to provide her whereabouts.  In essence, Ms. Dowling actively prevented Mr. Cook from having a relationship with Landyn because she took off with him and didn't provide contact information.  After the rodeo, Ms. Dowling's cell phone was disconnected.  *See* **Exhibit I - Affidavit of Desiree Dusang**, ¶ 7.  Moreover, Ms. Dowling told people who met her in Alpine, as well as other people and relatives who knew Ms. Dowling, that Mr. Cook was dead, in particular, that he had been killed in a "stabbing fight."  *See* **Exhibit J - Affidavit of Janna Conn**, ¶ 4; **Exhibit M - Affidavit of Shirley Williams**, ¶ 6; *see also* **Exhibit A - Affidavit of Gary Cook**, ¶ 4.j.

- Ms. Dowling said she was shocked by the Cook family's attendance at Landyn's funeral, and alleges that Mr. Cook had a tattoo on his arm with Landyn's name spelled incorrectly.  *See* Doc. # 19-2, ¶ 16.  The fact that Ms. Dowling was shocked by the Cook family's attendance at the funeral is due to the fact that she lied to the Cook family about the location and date of the funeral in the hope they would not appear.  The tattoo with Landyn's name was correctly spelled.  *See* **Exhibit B - Affidavit of Amy Cook**, ¶ 3.g.; **Exhibit A - Affidavit of Gary Cook**, ¶ 4.j.

- Ms. Dowling alleges that Mr. Cook never provided her any financial support and refused to pay child support.  *See* Doc. # 19-2, ¶¶ 21 & 22.  These statements are false.  *See* **Exhibit B - Affidavit of Amy Cook**, ¶ 3.h.; **Exhibit A - Affidavit of Gary Cook**, ¶¶ 4.o., p. & w.

- In her Declaration, Ms. Dowling describes her peregrinations before Landyn's death.  First, she says she moved to "nearby" Garland, Texas, where she lived with John Orr and Amber Pierson, and then she moved to Seven Points, Texas.  Then she says she went to school and worked at multiple jobs.  In his Declaration, Mr. Orr says he never saw or heard from Mr. Cook during the time Ms. Dowling resided with him.  *See* Doc. # 19-2, ¶¶ 18-20; Doc. # 19-5, ¶¶ 8-9.  These statements are misleading and omit crucial information.  First, Garland was not "nearby" but was 80 miles from Malakoff, where Mr. Cook lived, and Ms. Dowling never informed the Cook family she had moved to Garland.  Seven Points is 19 miles from Malakoff, but Mr. Cook didn't know Ms. Dowling's address there, which she refused to provide.  Second, Ms. Dowling omits any reference to her move to Alpine, Texas, which was over 500 miles from Malakoff, and the fact that

she never told Mr. Cook she had moved there.  During this time period Mr. Cook and his family did not even know where Ms. Dowling and Landyn were. Furthermore, Ms. Dowling fails to mention anything about her activities in Alpine, where she married an older gentleman, Roy Largent, after which she took up with his employee, Mike Willson,[2] and where she told people that Mr. Cook was dead, having been killed in a "stabbing fight."  *See* **Exhibit A - Affidavit of Gary Cook**, ¶¶ 4.l., m., n. & q.; **Exhibit M - Affidavit of Shirley Williams**, ¶ 10; **Exhibit J - Affidavit of Janna Conn**, ¶¶ 4 & 12.

- Ms. Dowling claims that she moved to Sargents, Colorado a week before the accident to pursue a job opportunity.  *See* Doc. 19-2, ¶ 23.  This story is questionable, because Sargents is a very small town with less than 150 people. Moreover, other evidence indicates Ms. Dowling moved to Colorado only two or three days before the accident.  *See* **Exhibit A - Affidavit of Gary Cook**, ¶ 4.q.; ¶ 5; **Exhibit N - Victim Advocate Kristen Foust's March 10, 2013 email (CSP REPORT 000128-000129)**.

- Ms. Dowling tries to cast a negative light on Mr. Cook's efforts to establish his paternity of Landyn, which Ms. Dowling initially denied.  *See* Doc. # 19-2, ¶ 25. Ms. Dowling's statements are misleading and omit crucial information, including her resistance to having Mr. Cook's name placed on Landyn's Death Certificate. Mr. Cook's paternity was officially recognized by a Court in Texas, which determined that Mr. Cook and Ms. Dowling each had a 50% interest in Landyn's

---

[2] In the online obituary after Landyn's death, Ms. Dowling falsely represented that Mike Willson was her children's father.

estate.  *See* **Exhibit A - Affidavit of Gary Cook**, ¶ 4.r; **Exhibit U - Judgment Declaring Heirship.**

- Ms. Dowling makes claims about Mr. Cook wanting to take Landyn to a "Pasture Party" where binge drinking would occur.  *See* Doc. # 19-2, ¶ 26.  These statements are untrue.  *See* **Exhibit A - Affidavit of Gary Cook**, ¶ 4.s.

- Ms. Dowling asserts that Landyn never thought of Mr. Cook as his father, and Mr. Cook never treated Landyn as his son.   She also claims she never discouraged Mr. Cook from participating in Landyn's life, but he did nothing to participate. *See* Doc. # 19-2, ¶¶ 27-28.  These statements are false, as shown by the Cook photos in particular.  *See* **Exhibit A - Affidavit of Gary Cook**, ¶¶ 4.t & u.

- Ms. Dowling claims that Landyn never even spent a night with Mr. Cook.  *See* Doc. # 19-2, ¶ 29.  This statement is false.  *See* **Exhibit A - Affidavit of Gary Cook**, ¶ 4.v.

- Ms. Dowling claims Mr. Cook never provided any financial support for Landyn.  *See* Doc. # 19-2, ¶ 30.   Ms. Dowling's allegations are false.  *See* **Exhibit B - Affidavit of Amy Cook**, ¶ 3.h.; **Exhibit A - Affidavit of Gary Cook**, ¶ 4.w.

- Ms. Dowling claims that during Landyn's life, she was never hard to find, and Mr. Cook could have established a relationship with Landyn if he had tried.  *See* Doc. # 19-2, ¶ 31.  These assertions are false and misleading.  In particular, Ms. Dowling never mentions her move to Alpine, Texas, and her conduct and activities there.  *See* **Exhibit A - Affidavit of Gary Cook**, ¶¶4.q. & x; ¶ 5.

- Ms. Dowling states that Mr. Cook never sought court intervention to establish parenting time with Landyn.  *See* Doc. # 19-2, ¶ 32.  These statements are untrue.  *See* **Affidavit of Gary Cook**, ¶¶ 4.p. & y.

- Ms. Dowling asserts that she is hurt because Mr. Cook never showed attention or affection to Landyn during his brief life.  *See* Doc. # 19-2, ¶ 33.  These statements are false.  *See* **Exhibit A - Affidavit of Gary Cook**, ¶ 4.z.

**B.      Pursuant to the statutory factors, anything less than a 50% apportionment to Mr. Cook would be unjust.**

In making its determination regarding the allocation of the settlement proceeds under C.R.S. § 13-21-201(1)(c)(III), the court "shall consider each parent's relationship with the deceased, including custody, control, support, parental responsibility, and any other factors the court deems pertinent."

There are no reported cases in Colorado in which courts have applied this statutory language.  However, the statutory history demonstrates that the statute should be applied upon an equitable basis, rather than upon a rigidly mathematical or legalistic basis.  In 1998 the Colorado Court of Appeals decided *Brill v. Hughes*, 958 P.2d 529 (Colo.App. 1998), interpreting an earlier version of C.R.S. § 13-21-201(1)(c).  In *Brill* the issue was the apportionment of the proceeds of an arbitration award for uninsured motorist benefits.  The case arose out of a 1993 roll-over accident in which a 15-year-old girl died.  The father, Brill, brought a declaratory judgment action against the mother, Hughes, claiming a 50% entitlement to the arbitration proceeds.  The mother objected, pointing out that for her whole life the daughter resided with and was supported by her mother, without any help from the father.  However, the statute applicable at that time stated the mother and father

"shall each have an equal interest in the judgment" without any qualifications.  958 P.2d at 531.  The trial court granted summary judgment in favor of the father, holding he was entitled to a 50% share of the proceeds.  The mother appealed but the court of appeals affirmed.  The court held that the wrongful death statute had to be strictly construed and "the plain language of § 13-21-201(c) clearly and unambiguously provides that the parents must share equally in any judgment."  *Id*. at 532.  The court recognized that "the inequity that may result here by application of the statute's express provision is disconcertingly obvious . . . ."  *Id.*  However, it held that it was bound by the language of the statute, and "any change must be made by the General Assembly."  *Id.*

Taking up this invitation, in 2000 the General Assembly added the statutory language in § 13-21-201(1)(c)(II)-(III), which is currently in force.  Since the statute was enacted to correct the inequity that results in cases of equal division of wrongful death proceeds where one parent has abandoned or failed to support a child, it is clear that the current statute should be applied to obtain an equitable result.  Thus, the Court should not make its decision mathematically, simply based upon the amount of time the deceased child spent with each parent, but should weigh all the factors, including "any other factors the court deems pertinent."

In considering all the pertinent factors in this case, the Court should reach a determination allocating no less than 50% of the proceeds to Mr. Cook. This is an unusual case because it involved a teenage pregnancy, where the father and mother were young and immature.  To make matters more complicated, the father, Mr. Cook, has a learning disability and a seizure disorder.  Ms. Dowling initially denied Mr. Cook's paternity, and there was never a court order in place establishing parenting time or child support.  While

Ms. Dowling had physical custody of Landyn the vast majority of the time, this was not because of any judicial mandate.

An examination of all the pertinent factors shows that Mr. Cook did not abandon or fail to support Landyn.  Mr. Cook and his family sought to have a relationship with Landyn, and the photographs of the times when they were together depict a close familial bond.  But Ms. Dowling, thwarted the efforts of Mr. Cook and his family to maintain contact with Landyn, by failing and refusing to provide information about her whereabouts, and then moving away from Mr. Cook to several other locations, including Alpine, Texas, where her behavior may be fairly characterized as bizarre, to say the least.  Ms. Dowling's conduct during the last several years of Landyn's life, if not intended to minimize any involvement by Mr. Cook, certainly had that practical effect.  She had a relationship with a married man, Mr. Sells, and had another child, Raylee.  Then, she moved to Alpine, where she told the story (apparently to evoke sympathy) that the fathers of her children were dead and that she had cancer.  She wove this tale to exploit the generosity of others, including Mr. Largent, whom she married and promptly deserted, and then took up a relationship with Mike Willson, whom she later falsely claimed to be the father of her children.  All the while this was going on, Mr. Cook and his family had no knowledge of her or Landyn's whereabouts.

There is also evidence of abusive and very irresponsible conduct by Ms. Dowling. *See* Affidavit of Janna Conn, ¶¶ 8-10 (describing physical abuse of Landyn).  Contrary to Ms. Dowling's assertion in the Memorandum, the evidence generated during the investigation of the accident supports the conclusion that Ms. Dowling did not have Landyn, who was five, secured in a child booster seat.

## CONCLUSION

Ms. Dowling's credibility is seriously at issue. The evidence does not support the allocation she seeks. Application of all the pertinent factors on an equitable basis would make any apportionment of less than 50% to Mr. Cook unjust. For these reasons, after the hearing, the Motion should be denied.

WHEREFORE, Mr. Cook respectfully requests the Court to conduct an evidentiary hearing, as statutorily required; to deny Ms. Dowling's Motion to Allocate Settlement Proceeds Re: Landyn Scott Dowling, Deceased; to allocate the settlement proceeds resulting from the death of Landyn between Mr. Cook and Ms. Dowling, in an amount not less than 50% to Mr. Cook; and to grant such other and further relief as the Court deems just and proper under the circumstances.

Respectfully submitted this 21st day of September, 2017.

**GREGORY R. GIOMETTI & ASSOC., P.C.**

*Original Signature on File*
*s/ Gregory R. Giometti*
Gregory R. Giometti, #16868
Morgan C. Robinson, #48296
Gregory R. Giometti & Associates, P.C.
50 S. Steele Street, Suite 480
Denver, CO 80209
Phone:          (303) 333-1957
Fax:              (303) 377-3460
E-mail:         ggiometti@giomettilaw.com
                   mrobinson@giomettilaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of September, 2017, a true and correct copy of the foregoing **SHAWN COOK'S RESPONSE TO PLAINTIFF JAMIE LEE DOWLING'S MOTION TO ALLOCATE SETTLEMENT PROCEEDS RE: LANDYN SCOTT DOWLING, DECEASED** was filed and served via email, CF/ECF addressed to the following:

OLLANIK LAW, LLC
1439 Wildwood Lane
Boulder, CO  80305
(303) 579-9322
stuart@ollanik-law.com

Steven A. Shapiro
SHAPIRO WINTHERS & MCGRAW, P.C.
2000 S. Colorado Boulevard
Tower One, Suite 9000
Denver, CO 80232
(303) 861-1000
sshapiro@colorado-law.net

Lance A. Cooper
THE COOPER FIRM
531 Roselane Street, Suite 200
Marietta, GA  30060
(770) 655-0598
lance@thecooperfirm.com

*Attorneys for Plaintiff*

*Original signature on file*
*s/ Leslee Randolph*
Leslee Randolph, Paralegal