IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 15-cv-00445-KLM

JAMIE LEE DOWLING, individually, as surviving mother of Landyn Scott Dowling,

    Plaintiff,

SHAWN COOK,

    Plaintiff-Intervenor,

v.

GENERAL MOTORS LLC, and
KEY SAFETY SYSTEMS, INC.,

    Defendants.
_____

# FINAL ORDER AND JUDGMENT
_____

**ENTERED BY MAGISTRATE JUDGE KRISTEN L. MIX**

    This matter is before the Court on Plaintiff's **Motion to Allocate Settlement Proceeds Re: Landyn Scott Dowling, Deceased** [#19][1] (the "Motion"). The Court has reviewed the Motion [#19], Response [#26], Reply [#32], exhibits, transcript of the hearing [#56; #57], the case file, and the applicable law, and is sufficiently advised in the premises. For the reasons set forth below, the Motion [#19] is **GRANTED in part** and **DENIED in part**.

---

[1] [#19] is an example of the convention the Court uses to identify the docket number assigned to a specific paper by the Court's case management and electronic case filing system (CM/ECF). This convention is used throughout this Order.

## I. Background

This wrongful death action arises from the tragic deaths of Jamie Lee Dowling's ("Plaintiff") two young children in a car accident that occurred on March 9, 2013. Plaintiff filed the lawsuit in this Court on March 3, 2015. *Compl.* [#1]. The Complaint [#1] alleges that Plaintiff's car, a 2008 Chevrolet Cobalt, was defective in its design and manufacture, which resulted in loss of control and subsequent failure of the air bags to deploy. The matter was transferred to the Southern District of New York on March 16, 2015, *see* [#6], and thereafter was remanded to this Court on March 10, 2017, for purposes of approval and distribution of settlement proceeds. *See* [#8-2]. On April 27, 2017, all settlement proceeds with respect to Plaintiff's daughter, Raylee Kay Dowling ("Raylee"), were allocated to Plaintiff by the Court. *Minute Order* [#17].

On August 10, 2017, Plaintiff filed a Motion to Allocate Settlement Proceeds [#19] with respect to her son, Landyn Scott Dowling ("Landyn"). Shawn Willis Cook ("Cook"), who is Landyn's biological father, was permitted to intervene in this case on November 3, 2017. He thereafter filed a Response [#26] and Exhibits [#27] seeking 50% of the settlement proceeds. The Court scheduled an evidentiary hearing, which was held on January 9-10, 2018. *See* [#49, #50]. At the hearing, the Court heard testimony from Plaintiff, Aaron Buettner (Plaintiff's husband), Dana Valderas (Plaintiff's mother), Calvin Dowling (Plaintiff's father), Christopher Michael Allen (Plaintiff's friend), and Jamie Perdue (Plaintiff's friend and former roommate) on behalf of Plaintiff. The Court also heard testimony from Mr. Cook, Janna Conn (Plaintiff's former friend and babysitter), Shirley Williams (pastor at Plaintiff's former church), and Amy Cook (Mr. Cook's mother) on behalf

of Mr. Cook.

The following is a summary of relevant testimony from the hearing. Plaintiff and Mr. Cook met and began dating in high school. They attended different schools. Plaintiff became pregnant while she was a junior in high school, after Mr. Cook had graduated from high school. Plaintiff testified that she rented a small house and lived with Mr. Cook while she was still pregnant. Mr. Cook testified that Plaintiff found the house and Mr. Cook rented it for the couple to live in together, but that Plaintiff never actually lived there. Landyn was born on November 2, 2007. Plaintiff testified that Mr. Cook did not see Landyn more than approximately a half-dozen times in his life, that Mr. Cook refused to sign the birth certificate, that Mr. Cook refused to ever help financially with Landyn's care, and that Landyn never stayed the night with Mr. Cook or his family. During Landyn's life of less than five and one-half years, Plaintiff lived in at least eleven different places and at one point moved approximately 500 miles away from where Landyn was born without notifying Mr. Cook. Plaintiff provided very little evidence regarding how she paid Landyn's expenses. She testified that she worked as a ranch hand, in medical offices and as a waitress, but that she was also attending school. She presented no testimony or documentary evidence about her earnings or Landyn's expenses during his life. It is also clear that Plaintiff had romantic relationships with several other men during Landyn's lifetime.

Mr. Cook testified that he has a learning disability and seizure disorder. He stated that he visited Landyn at the hospital when he was born, that he and Plaintiff completed a DNA test which confirmed Mr. Cook's paternity, and that he provided money to Plaintiff for Landyn's support approximately every week or every other week for the first several years

of Landyn's life.  Mr. Cook testified that he knew that a father could enforce legal rights, but that he was stymied by the fact that his name was not on Landyn's birth certificate.  He testified that when he visited Plaintiff and Landyn at the hospital after Landyn's birth, he asked Plaintiff if he needed to sign the birth certificate and she responded in the negative. Mr. Cook further testified that he wanted to see Landyn more, and that in 2011, he met with an attorney who drew up "some paperwork" to establish Mr. Cook's parental rights and obligations.  Mr. Cook's mother and then-girlfriend went to Plaintiff's house to get Plaintiff's signature on the document, entitled "Application for a New Birth Certificate Based on Parentage."  Plaintiff refused to sign it, became angry and violent, and then called Mr. Cook to tell him that he would never see his son again.

Plaintiff moved to Colorado, assisted by her "friend" Michael Wilson, in March 2013. On March 9, 2013, Plaintiff had a car accident and both Landyn and Raylee died.  Mr. Cook testified that at Landyn's funeral, Plaintiff arranged to have it announced that Michael Wilson, not Mr. Cook, was the father of both children.

## II. Legal Standard

Pursuant to the Colorado Wrongful Death Act, the mother and father of a deceased minor child without descendants "shall have an equal interest in the judgment" related to the wrongful death of the child.  Colo. Rev. Stat. § 13-21-201(1)(c).  However, "[f]or cases in which the father and mother are divorced, separated, or living apart, a motion may be filed by either the father or the mother . . . requesting the court to apportion fairly any judgment awarded in the case."  Colo. Rev. Stat. § 13-21-201(1)(c)(II).  The parties do not argue that the statute's use of the term "judgment" precludes its application to settlement

proceeds, the funds at issue in this case, and precedent appears to interpret the term "judgment" as non-exclusive. *See Campbell v. Shankle*, 680 P.2d 1352, 1353-54 (Colo. App. 1984) (addressing the settlement proceeds recovered by a plaintiff in a wrongful death action and explaining that "the proper method for distribution of monies recovered in connection with a wrongful death action must be derived exclusively from the terms of the wrongful death statute"); *see also Klancke v. Smith*, 829 P.2d 464, 466 (Colo. App. 1991) (same). After holding a hearing, the court must determine the percentage of the proceeds to be awarded to each parent. Colo. Rev. Stat. § 13-21-201(1)(c)(III). "In making such a determination, the court shall consider each parent's relationship with the deceased, including custody, control, support, parental responsibility, and any other factors the court deems pertinent." *Id.*

### III. Analysis

As an initial matter, the Court finds that Plaintiff's testimony lacks credibility overall, and specifically as to the nature of Mr. Cook's relationship with their son.[2] More specifically, the Court finds that her contentions that Mr. Cook was physically abusive towards her, *Tr.* [#56] at 109, that he was not interested in a relationship with Landyn and never provided

---

[2] Among other falsehoods, Plaintiff admitted that she falsely told an unspecified person or persons at the hospital at the time of the accident that Mr. Wilson was her husband so that he could make medical decisions and contact her parents. *Tr.* [#56] at 58-59; 107. She testified that she had the same phone number "the whole time when [she was] dating Mr. Cook to now," although she recanted that testimony on cross examination. *Tr.* [#56] at 57, 98-99. She admitted that she told the minister who was conducting the funeral service for the children to announce that Mr. Wilson was the children's father. *Tr.* [#56] at 107-108. She testified that even after the funeral she refused to acknowledge that Mr. Cook was Landyn's father, *Tr.* [#56] at 108, going so far as to deny his paternity to an insurance company after Landyn's death, despite a conclusive DNA test within a few weeks of Landyn's birth confirming Mr. Cook's paternity. *Tr.* [#56] at 108; Exh. 5.

financial support, *Tr.* [#56] at 115-17, and that Mr. Cook saw Landyn less than a half-dozen times during Landyn's life, *Tr.* [#56] at 27-28, were squarely contradicted by testimony of Mr. Cook and his mother, whose testimony was credible. The Court further notes that many of Plaintiff's most outrageous written assertions against Mr. Cook in her affidavit in support of the Motion [#19-2] were not repeated in her oral testimony, thereby creating further doubts about her credibility.[3] Indeed, the Court has difficulty believing Plaintiff's unsupported testimony because much of it appears to be fabricated.[4]

The Court finds credible Mr. Cook's testimony that he tattooed Landyn's name (correctly spelled) on his arm when his son was born, *Tr.* [#57] at 6-8, that Plaintiff found and then Mr. Cook rented a house for Plaintiff and himself to reside in during her pregnancy with Landyn, *Tr.* [#56] at 194-95, that he and Plaintiff had a photograph taken at Wal-Mart of Landyn when the baby was about one week old, Tr. [#56] at 197-98, that Mr. Cook and his mother regularly provided money to Plaintiff to assist with Landyn's care before Plaintiff

---

[3] For example, in Plaintiff's affidavit she alleged that she took Landyn to Mr. Cook's parents' home for a boating outing with the Cooks' other grandchildren, but when she discovered that the Cooks had life preservers for every child other than Landyn, she refused to allow him to go. [#19-2] at 3. Although Plaintiff did not repeat this allegation during her in-court testimony, Mrs. Cook squarely refuted it (over no objection from Plaintiff's counsel), stating: "That's not true. I have 36 life jackets in my attic and several in the boat and my rule is nana's rule. Any of my grandchildren go on the boat dock, they have to have a life jacket. We go on the boat. We go swimming in the lake. They have to have a life jacket on." *Tr.* [#57] at 48.

[4] For purposes of clarity and thoroughness, the Court specifically finds that Plaintiff's testimony about a telephone call with Mr. Cook two to three months before Landyn's death lacks credibility, and the Court therefore affords it no weight. More specifically, Plaintiff testified that she asked Mr. Cook about having a relationship with Landyn and said she was "tired of chasing him" (despite admitting that she had moved 500 miles away approximately a year earlier and had had no further contact with Mr. Cook since that time), and that Mr. Cook allegedly responded that he was "out" of any relationship with Landyn. Mr. Cook denied that the conversation occurred. *Tr.* [#56] at 49; 207.

-6-

moved away, *Tr.* [#56] at 198-99, that Plaintiff refused to permit Mr. Cook to visit Landyn on certain occasions, *Tr.* [#56] at 200-02, and that the Cook family arranged visits, including overnight stays, with Landyn. *Tr.* [#56] at 202.

Given these findings, to the extent that Plaintiff contends that Mr. Cook should be entirely denied settlement proceeds due to his alleged lack of involvement with his son, the Motion [#19] lacks merit. The Court now turns to consideration of the factors listed in Colo. Rev. Stat. § 13-21-201(1)(c)(III).

**A.     Custody and Control**

The Court finds that Plaintiff had primary custody and control of Landyn during his lifetime. However, the Court is troubled by the lack of evidence regarding the nature of the mother/child relationship. Plaintiff herself provided very little testimony about the nature of that relationship: she testified that, on looking at Landyn for the first time, she felt that he was perfect and that her "heart didn't know what to do." *Tr.* [#56] at 31. Despite Plaintiff's very general representation of a normal mother/child relationship with Landyn, Plaintiff's former friend and babysitter, Janna Conn, a mother of four children, testified credibly through tears to the contrary. Ms. Conn stated that she had observed Plaintiff's "extremely abusive" treatment of Landyn, including hitting him "a lot," putting "her fingers in his mouth and pull[ing] him" and "smack[ing] him while she was doing that," including with a wooden spoon. Ms. Conn further testified that she "bought [Plaintiff] some child rearing books" to try to help her learn to properly discipline Landyn. She stated that she "saw a side of [Plaintiff] that was kind of scary." *Tr.* [#56] at 167. Ms. Conn stated that after the children's death, Plaintiff called her and "apologized to me for being a bad mom." *Tr.* [#56] at 171.

While these statements are not determinative, they reflect a relationship between Plaintiff and Landyn that was undoubtedly less than ideal.

It also appears to the Court that Mr. Cook was not entirely to blame for his lack of significant involvement in the custody and control of Landyn, and consequent lack of a consistent relationship with him. The Court finds that Mr. Cook made efforts to be a part of Landyn's life, which Plaintiff thwarted. Mr. Cook credibly testified about his desire to have a relationship with his son, the financial support that he provided, and submitted photographs that document Mr. Cook as a proud parent of a toddler. *Tr* [#57] at 17, 18, 20; *Tr.* [#56] at 198-99; [#26-4].

The Court also finds credible the testimony of Mr. Cook's mother regarding their efforts to establish Mr. Cook's parental rights and obligations in 2011, when Landyn was approximately three years old. Mrs. Cook testified that Mr. Cook met with a lawyer and completed paperwork to "get Shawn's name on the birth certificate," which Mrs. Cook and Mr. Cook's then-girlfriend took to Plaintiff's apartment for her signature. *Tr.* [#57] at 51-53; *See* Exh. 14: Application for New Birth Certificate Based on Parentage. The Court further finds credible Mrs. Cook's testimony that during this encounter, Plaintiff became angry and violent, "screaming and then she pushed" Mr. Cook's girlfriend. Mrs. Cook further stated that Plaintiff then threatened that she would take Landyn away and that Mr. Cook would never see him again. *Tr.* [#57] at 52-53. In fact, after Mr. Cook's mother presented the Application to Plaintiff, Plaintiff called Mr. Cook and told him that he would never see his son again. *Tr.* [#56] at 204-05. Mr. Cook testified that after that incident in 2011, he could not reach Plaintiff via her cell phone and did not know where she lived with Landyn after that

time. *Tr.* [#56] at 205-07. He was not aware that Plaintiff had moved to Alpine, Texas, which was more than 500 miles away. *Tr.* [#56] at 206. Mr. Cook's testimony that he was unable to reach Plaintiff because the cell phone number he had for her was disconnected is corroborated by the fact that, after initially denying that she had ever changed her cell phone number, Plaintiff admitted on cross-examination that she did in fact obtain a new cell phone number after moving to Alpine. *Tr.* [#56] at 99.

The Court further finds credible Mrs. Cook's testimony about Plaintiff's behavior. Mrs. Cook testified that while Plaintiff was dating Mr. Cook before her pregnancy, she asked permission to live at the Cook home (where Shawn Cook also resided) because she was taking extra classes at a school that was much closer to the Cook home than her own home. Mrs. Cook stated that she and her husband decided that it was better for Plaintiff to remain living with her mother. *Tr.* [#57] at 31-32. Mrs. Cook further stated that she first saw Landyn "a couple of weeks after he was born," as Mr. Cook picked him up and brought him to the Cook family home because Mrs. Cook wanted to do a DNA test. *Tr.* [#57] at 33. She recalled that Mr. Cook "helped [Plaintiff] out a lot" during Landyn's first year, and that he "would actually go stay with her at her mother's house and help care for the baby. . . . He bought her a crib. He bought diapers. He's bought her – the baby clothes. What Landyn needed he would provide." *Tr.* [#57] at 35. Mrs. Cook further testified that she and her husband had a crib in their home for Landyn, and that she offered to watch Landyn so Plaintiff could complete her schooling. *Tr.* [#57] at 36-37. She identified photographs of Landyn at her home taken at Christmas in 2008, and stated that Plaintiff brought Landyn to the Cook family home on that occasion. *Tr.* [#57] at 40; Exh. 1. Mrs. Cook explained that

during 2009, Mr. Cook saw Landyn two or three times a week at their home where Mrs. Cook was helping to care for him, and that Landyn frequently spent the night there. *Tr.* [#57] at 41-43. She stated that Plaintiff "demanded money every time she came" to the Cook family home. "[S]he wanted money and, under the circumstances, if we wanted to see Landyn we had to pay her." *Tr.* [#57] at 42-43. Mrs. Cook stated that Mr. Cook started spending less time with Landyn in 2010 because his relationship with Plaintiff was deteriorating. "[H]e tried all the time to call and see if he could see his son and she wouldn't allow it and we'd get into arguments. She would call me on the phone also because I asked her if we could see Landyn." *Tr.* [#57] at 44-45. Mrs. Cook explained that although Plaintiff demanded money "every time she would show up" at the Cook home, Mrs. Cook refused to give her cash because "I didn't know what it was going for." Instead, Mrs. Cook stated that if Landyn needed medicine, she would write a check to a pharmacy or obtain the medicine herself. *Tr.* [#57] at 46. Mrs. Cook recounted a strange conversation with Plaintiff in 2010 where Plaintiff indicated that she had met a "traveling doctor from Oklahoma" and they had gotten married. *Tr.* [#57] at 46-47. Shortly after that conversation, Plaintiff's daughter Raylee, who also died in the accident, was born. In June of 2011, the Cook family had a family reunion and Landyn stayed at the family home for four days, including overnights. *Tr.* [#57] at 50. Plaintiff telephoned Mrs. Cook and promised to bring Landyn to visit Mr. Cook and his family around Christmas-time in both 2011 and 2012, and then failed to call or appear on both occasions. *Tr.* [#57] at 54-56. After Plaintiff moved away from the area where Landyn was born, she refused to tell Mrs. Cook where she was living. *Tr.* [#57] at 55. The record amply demonstrates that Plaintiff attempted to manipulate both

Mr. Cook and his parents in an effort to obtain funds or gifts before allowing Mr. Cook to spend time with his son.

**B.     Support**

As discussed above, the Court finds Plaintiff's statement that she provided 100% of Landyn's financial support not credible. Specifically, Plaintiff's bald-faced statements in her Motion [#19] that Mr. Cook "abandon[ed] his son at birth," that he "provid[ed] not one nickel of financial support or one day of care and responsibility" for Landyn, and that Landyn never spent the night with Mr. Cook are patently untrue. *See Motion* [#19] at 2.

Mr. Cook testified that he provided financial support in the form of cash or purchasing supplies at Wal-Mart every one or two weeks during the first several years of Landyn's life, and that he gave Plaintiff as much money as he could, aside from the gas money he needed, while making $10 per hour at his job. *Tr.* [#56] at 198-99. Although Mr. Cook did not have documentary proof of those purchases or payments, the Court nevertheless finds his testimony credible, particularly considering Mr. Cook's and his mother's testimony that Mr. Cook reads and spells at a second- or third-grade level, was enrolled in special education classes at school and that Mr. Cook's mother handles Mr. Cook's bank account to this day. *Tr.* [#56] at 192; [#57] at 10. Mr. Cook also credibly testified that he bought Plaintiff a set of tires on one occasion, and that he paid Plaintiff "a couple or three hundred dollars" more than once. *Tr.* [#57] at 23. In addition, Mrs. Cook testified that she provided "day care checks" to Plaintiff as well as other financial support. *Tr.* [#57] at 51.

Mr. Cook conceded that his financial contributions to Plaintiff decreased in 2010 because Plaintiff would only let him see Landyn when he gave her money. He became

-11-

hesitant to turn cash over to Plaintiff because his visits with Landyn were getting shorter and Plaintiff's monetary demands were getting higher. *Tr.* [#56] at 201. Mr. Cook credibly testified that he would have been fine with paying weekly child support for Landyn if he had been able to see his son, and that he would have enforced his parental rights to see his son if his name had been on the birth certificate, or if he could have found out where Plaintiff was living in order to do so. *Tr* [#57] at 17, 18, 20. Mrs. Cook's testimony about her attempt to obtain Plaintiff's signature on the Application for a New Birth Certificate Based on Parentage supports this testimony. *Tr.* [#57] at 51-53; Exh. 14. Mr. Cook also paid Plaintiff $7,500 out of a $30,000 insurance settlement arising from Landyn's death for "back child support." *Tr.* [#57] at 25; Exh. 15. [#27-11].

**C.    Parental Responsibility**

With respect to parental responsibility, the Court finds particularly troubling Plaintiff's assertions that it was Mr. Cook's responsibility to seek a court order regarding visitation with Landyn, *Tr.* [#57] at 14, and that Mr. Cook "never took any responsibility for the child" and "abandoned" him. *Brief* [#19-1] at 14. In light of Plaintiff's numerous complaints about Mr. Cook and his alleged behavior toward her and Landyn, her assertion that she wanted Mr. Cook to go to court to enforce his parental rights and also wanted Landyn to have a relationship with Mr. Cook is simply unworthy of belief. *Tr.* [#56] at 115. Moreover, her own failure to obtain a custody and support order for Landyn given her alleged repeated abusive and destructive encounters with Mr. Cook during Landyn's life is patently incongruous. This inconsistency further impairs her credibility. Finally, her allegation that Mr. Cook denied Landyn attention and affection is flatly contradicted not only by his testimony and demeanor

during the hearing, but also by Mr. Cook's numerous photographs of and with Landyn. [#26-4].

**D.    Attorneys' Fees**

Plaintiff asserts that the Court may only allocate the net settlement proceeds, after payment of attorneys' fees and costs.   [#19] at 2.  In support of that contention, Plaintiff cites a single case, *Clint v. Stolworthy*, 357 P.2d 649, 650 (Colo. 1960).  In *Stolworthy,* the Colorado Supreme Court addressed the question of whether an heir who personally suffered no pecuniary loss from the death of the decedent could nevertheless share in the proceeds of a judgment obtained by the decedent's widow under the Colorado Wrongful Death Act. Based on the explicit language of the statute, the court concluded that the proceeds should be divided among heirs.  In reaching its decision, the *Stolworthy* court merely noted as background information that the widow had received a net sum from the wrongful death judgment "after payment of attorneys fees and other expenses *which were conceded* to be necessary and reasonable." *Id.* (emphasis added). The Court engaged in no analysis regarding the propriety of this concession, nor did the Court discuss any statutory requirement for deduction of fees and expenses from the gross judgment proceeds before further allocation. Simply stated, *Stolworthy* does not stand for the proposition that the Court must only allocate the net proceeds available after payment of fees and expenses, and the Court has not located any other legal authority, in the statute itself or elsewhere, which so dictates.   Indeed, Plaintiff's request appears to be based on a private fee agreement between herself and her counsel ("Plaintiffs [sic] seek an Order allowing payment of attorney fees on the total amount of recovery per the terms of the fee agreement." [#19] at 2.).  The

terms of the fee agreement are not before the Court, nor is any dispute relating to it. Hence, to the extent that Plaintiff requests that the Court enter an Order allocating the settlement proceeds after deduction for attorneys' fees and costs, the Motion is **DENIED in part.**

## IV. Conclusion

In light of the factors set forth in the statute, the facts adduced at the hearing and the Court's assessment of the parties' credibility,

IT IS HEREBY **ORDERED** that the Motion [#19] is **GRANTED in part** and **DENIED in part**. The Court allocates the gross settlement proceeds with respect to Landyn Scott Dowling as follows: sixty-five percent to Plaintiff and thirty-five percent to Intervenor Shawn Cook, and judgment shall enter accordingly.

The Clerk of Court is directed to close this case.

Dated: March 30, 2018

BY THE COURT:

Kristen L. Mix
United States Magistrate Judge